```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 14, 2016
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
:
ALFREDO RIVERA,                                                    :
:
                            Petitioner,              :
:
                -v-                                       :    10-cr-316 (KBF)
:    15-cv-8328 (KBF)
UNITED STATES OF AMERICA,                                          :
:    OPINION & ORDER
                            Respondent.              :
------------------------------------------------------------------ X

KATHERINE B. FORREST, District Judge:

      The Court has reviewed petitioner Alfredo Rivera's motion, through counsel, to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 on grounds of ineffective assistance of counsel. (Pet., 10-cr-316, ECF No. 134; 15-cv-8328, ECF No. 1.)[1] Rivera was convicted at a jury trial on February 2, 2012, of the two charges against him in the indictment: (1) conspiracy to distribute and to possess with intent to distribute at least five kilograms of cocaine, in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(A), 846, and using and carrying a firearm during and in relation to a drug trafficking crime, and with possessing a firearm in furtherance of such crime, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), (c)(1)(C), 2. On June 27, 2012, this Court sentenced Rivera principally to a term of 180 months' imprisonment. (ECF No. 102.) Rivera appealed his conviction, arguing that the Government failed to present sufficient evidence of his predisposition to commit the charged crimes to defeat his entrapment defense. The Second Circuit affirmed

---

[1] Unless otherwise noted, all citations to ECF in this Opinion & Order refer to the docket in case no. 10-cr-316.

Rivera's conviction by unpublished disposition. United States v. Jimenez, 552 F. App'x 51, 52 (2d Cir. 2014) (summary order). Rivera subsequently sought a writ of certiorari from the United States Supreme Court; his petition was denied. Rivera v. United States, 135 S. Ct. 153 (2014).

Rivera now argues that he received ineffective assistance of counsel because his trial counsel failed to pursue and/or advise Rivera regarding the acceptance of a plea bargain with the Government, and rendered constitutionally defective advice as to the likelihood of prevailing at trial. (Pet. at 1.) These arguments are wholly without merit, and for the reasons set forth below, Rivera's motion is DENIED.

No evidentiary hearing is necessary in this action. The combined submissions of the parties provide a sufficient basis upon which to deny the petition, and the Court concludes that a full testimonial evidentiary hearing would not offer any reasonable chance of altering its view on the facts as alleged by Rivera, including the details added in his petition. See Chang v. United States, 250 F.3d 79, 86 (2d Cir. 2001) (court need not hold an evidentiary hearing where the combined submissions of the parties provide a sufficient basis to deny the petition).

I. BACKGROUND

    A. Indictment

On April 12, 2010, Rivera, a retired New York City police officer, and his co-defendant, Rafael Jimenez, an auxiliary New York City police officer, were indicted (ECF No. 1), and Rivera was arrested the following day, April 13, 2010. Rivera was initially represented by the Federal Defenders of New York. On June 22, 2010,

David Goldstein entered a Notice of Appearance on behalf of Rivera, and was substituted as his counsel. (ECF No. 16; see Rivera Decl. ¶ 7, ECF No. 134.)

The Government filed a superseding indictment (the "Indictment") on September 26, 2011, that contained three counts. (ECF No. 56.) Count One charged Rivera and Jimenez with conspiracy to distribute and to possess with intent to distribute at least five kilograms of cocaine, from January 2010 through March 2010, in violation of 21 U.S.C. §§ 812, 841(a)(1), and 846. Count Two charged Jimenez with attempting to distribute and to possess with intent to distribute at least 100 grams of heroin, on January 14, 2010, in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(B), and 846, and 18 U.S.C. § 2. Finally, Count Three charged Rivera and Jimenez with using and carrying a firearm during and in relation to a drug trafficking crime, and with possessing a firearm in furtherance of such crime, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), (c)(1)(C), and 2. These charges stemmed from the defendants' agreement to provide armed protection for a large shipment of cocaine from Long Island to the Bronx, which was, in fact, a sting operation. On November 2, 2011, Jimenez pled guilty to Count One of the Superseding Indictment pursuant to a written plea agreement with the Government. (See ECF No. 73.)

    B.    <u>Trial</u>

Rivera chose to proceed to trial. A jury trial on the Superseding Indictment commenced on January 30, 2012 and ended on February 2, 2012. As further detailed below, the evidence at trial, which consisted largely of video and audio recordings, translated transcripts, and physical evidence, established that Rivera

conspired to transport and safeguard a shipment of cocaine, and that he possessed a gun in furtherance of that conspiracy.

Evidence introduced at trial demonstrated that Jimenez first offered to recruit Rivera to participate in the transportation of cocaine in early January 2010. On January 12, 2010, Jimenez met with confidential informant 1 ("CI-1") and told CI-1 that he had an armed retired police officer (i.e. Rivera) who could assist with the transportation and protection of a shipment of cocaine. (Tr. 51-52; GX 101D, 101.)[2] CI-1 told Jimenez that he would pay $1,000 per kilogram of cocaine transported. (Tr. 54; GX 101D, 101.) On January 26, 2010, Jimenez met with confidential informant 2 ("CI-2"), whom Jimenez believed to be an associate of CI-1. (Tr. 57; GX 102D, 102.) Jimenez called Rivera on speakerphone—so that CI-2 could hear—and asked Rivera if he was ready to help the people Jimenez had previously told him about. (GX 102D, 102; see Tr. 60.) Rivera replied that he was ready. (GX 102D, 102.)

On February 11, 2010, Rivera met CI-2 for the first time, with Jimenez present. (Tr. 63-64, GX 104D.) Rivera showed CI-2 a card identifying him as a retired police officer and a gun that Rivera described as a "fifteen plus one" (i.e. a gun holding 15 bullets in the magazine and one in the chamber). (GX 104D, 104.) During the meeting, CI-2 told Rivera that he needed "someone responsible enough . . . to move my stuff" (i.e. cocaine) "around New York," from "point A, . . . meaning my warehouse . . . where I keep my stuff to my customers." (GX 104D, 104.) In

---

[2] "Tr." refers to the trial transcript. "GX" refers to the Government Exhibits introduced at trial.

response to CI-2's question as to what would happen if the police stopped Rivera while he was transporting the cocaine, Rivera stated, "I just show them my I.D. and my shield and . . . they always say 'get out of here' . . . I never have trouble when the cops stop me." (GX 104D, 104.)

On February 23, 2010, Rivera met for a second time with CI-2 and Jimenez. (Tr. 67; GX 105D, 105.) When CI-2 asked Rivera if he would accept $10,000 for the job, Rivera responded that he would prefer $1,500 per kilogram of cocaine, for a total of $15,000. (GX 105D, 105.) Rivera ultimately agreed to accept $1,200 per kilogram and to pay Jimenez his share from that total. (GX 105D, 105.)

On March 12, 2010, Rivera met with confidential informant 3 ("CI-3") whom Rivera believed to be an associate of CI-2. (Tr. 80; GX 106D.) Rivera and CI-3 discussed obtaining prepaid cellphones to use in connection with the deal; Rivera said he would wait for CI-3's call about the deal. (GX 106D, 106.)

On March 23, 2010, Rivera received a call from CI-3 and drove to a shopping center in the Bronx while armed with a gun, picked up an SUV and then drove it to a warehouse in Long Island. (Tr. 86-89, 186.) Rivera met CI-2 at the warehouse, at which CI-2 told Rivera there were ten kilograms of cocaine (which in actuality was sham cocaine) in a bag in a nearby car. (Tr. 335.) Rivera took the bag, placed it in the SUV, and drove back to the Bronx. (Tr. 338-40.) Rivera—still armed with the gun—went into a restaurant, where CI-3 gave him a bag containing $12,000 in cash. (Tr. 90-95, 185-87.) On March 24, Rivera made two cash deposits, totaling $8,000, into his bank account. (GX 901, 902, 903.)

5

On March 25, 2010, Jimenez called Rivera asking for his share of the payment. (GX 201D, 201-A.) Rivera replied that he didn't know what Jimenez was talking about and said that if someone had told Jimenez that something had happened with respect to the cocaine deal, then that person was lying. (GX 201D, 201-B.) The next day, March 26, Rivera met with CI-3, who told Rivera to pay Jimenez $2,000 to make sure that Jimenez wouldn't speak to the police. (GX 110D, 110.) Rivera stated that he had already used the money and didn't have it anymore, and said that he "d[id]n't have a problem knocking [Jimenez] out" if necessary, but he "d[id]n't wanna kill him." (GX 110D, 110.)

As stated above, Rivera was arrested on April 13, 2010. (Tr. 357.) At the time of his arrest, Rivera was carrying a card that identified him as a retired NYPD officer and a nine millimeter handgun loaded with 15 rounds of ammunition. (GX 401, 403, 404, 405, 406, 702, 703.) Following his arrest, Rivera admitted that he had agreed with Jimenez and another person (CI-2) to transport 10 kilograms of cocaine in exchange for a $12,000 payment. (Tr. 359.) Later that day, FBI agents searched Rivera's apartment and found a .38 caliber handgun as well as the replica NYPD badge that Rivera had previously shown to CI-2. (Tr. 188.)

The defense case primarily relied on a theory of entrapment. Rivera testified at trial that during his initial January 26 call with Jimenez and CI-2—when he told Jimenez and CI-2 that he was "ready"—he was referring to the transportation of equipment he used in connection with a security job he worked with Jimenez. (Tr. 420.) Rivera then admitted to participation in the transaction that was the subject

6

of the Government's case. He claimed, however, that he only agreed to meet with the people he believed to be drug dealers because of relentless pressure from Jimenez, on whom he depended for employment income, and that after the initial meeting with CI-2 he was afraid to back out and feared for his life if he refused to participate. (Tr. 411, 422-26.) Rivera claimed that he ultimately transported what he believed to be cocaine because he "felt trapped" and was afraid that "he might get hurt" if he backed out of the deal. (Tr. 429-31.) On cross-examination, Rivera admitted to coming up with several ideas in connection with the transportation of the cocaine, including taking the cocaine to his house for a day for the cocaine to "cool down," getting his son-in-law involved in the deal, negotiating for a higher fee, proposing a suitable drop-off location, obtaining a prepaid cellphone, and trying to cut Jimenez out of the deal. (Tr. 440-42, 456-63.)

On February 2, 2012, the jury returned a verdict of guilty as to both counts in which Rivera was charged. (Tr. 626-28.)

C.  Sentencing and Direct Appeal

On April 3, 2012, this Court sentenced Jimenez principally to a term of 127 months' imprisonment. (ECF No. 92.) On June 27, 2012, this Court sentenced Rivera to a term of a 180 months' imprisonment,[3] to be followed by a term of 5 years' supervised release, and ordered that Rivera forfeit $12,000 and pay a $200 mandatory special assessment. (ECF No. 102; see ECF No. 107.) Rivera was

---

[3] The 180-month term of imprisonment was the minimum amount allowable under the law based on a 10-year mandatory minimum on Count One, a 5-year mandatory minimum on Count Three, and a requirement that the terms of imprisonment run consecutively.

7

subsequently represented by new counsel in his unsuccessful appeal to the Second Circuit and petition for a writ of certiorari to the Supreme Court.

>   D.    Allegations Relating to Rivera's § 2255 Motion

On October 5, 2015, Rivera brought the instant motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.  (ECF No. 134.)  In support of his motion, Rivera submitted a declaration in which he makes allegations as to the ways in which he believed that Mr. Goldstein provided him ineffective assistance.  (Pet., Ex. C ("Rivera Decl."), ECF No. 134.)  In his declaration, Rivera admits that Mr. Goldstein did inform him that the Government made him a plea offer calling for a 10-year minimum sentence, and states that he was aware that Jimenez decided to accept a plea deal and understood that Jimenez's plea would lead to a 10-year sentence.  (Rivera Decl. ¶¶ 15, 23.)  Rivera claims, however, that Mr. Goldstein did not inform him that there was a deadline to accept the Government's plea offer, did not advise him about the benefits of a plea agreement or the risks of losing at trial, did not advise him about the strength of the Government's case or the weakness of his entrapment defense, and that Mr. Goldstein advised him in December 2011 that it was too late to consider a plea agreement when Rivera said that he wished to accept a plea agreement and refused to discuss the matter further.  (Rivera Decl. ¶¶ 9, 18, 25-27.)

In response to this Court's October 23, 2016 Order (ECF No. 136), Mr. Goldstein submitted a declaration responding to Rivera's allegations of ineffective assistance (Goldstein Decl., ECF No. 138).  In his declaration, Mr. Goldstein states that he has been engaged in the practice of law (focusing on criminal law) for the

8

past 40 years; over that time, he has represented over 10,000 defendants, including several hundred in federal criminal proceedings, and has tried more than 100 criminal cases.  (Goldstein Decl. ¶ 2.)  Mr. Goldstein further explains that, after being retained, he reviewed the discovery provided by the Government and learned that the prosecution had strong evidence that Mr. Goldstein believed would conclusively establish that Rivera had transported what Rivera believed to be 10 kilograms of cocaine while carrying a gun, in exchange for a large cash payment.  (Goldstein Decl. ¶ 4.)  Mr. Goldstein states, however, that Rivera never denied the essential facts of the charges against him, but insisted that he was entrapped and therefore was not guilty of the charges.  (Goldstein Decl. ¶ 4.)

Mr. Goldstein's declaration further explains that he filed several pretrial motions, including to sever Rivera's from that of Jimenez and to suppress various types of evidence.  (Goldstein Decl. ¶ 5.)  Mr. Goldstein states that he attempted to obtain a favorable plea offer from the Government, but the Government declined to provide a formal, written plea offer, instead representing that if Rivera was prepared to plead guilty to Count One (the conspiracy to distribute charge) and accept a two-level enhancement for possessing a gun in connection with that offense, the Government would agree to dismiss the remaining charges against him.  (Goldstein Decl. ¶ 7.)  The proposed plea would have subjected Rivera to a mandatory minimum of 10 years' imprisonment.  (Goldstein Decl. ¶ 7.)

Mr. Goldstein states that he shared the Government's informal plea offer with Rivera soon after receiving it, and advised Rivera that he could avoid a 15-year

mandatory minimum sentence if he pled guilty before trial, but that he could not be sentenced to less than 10 years' imprisonment under the terms of the plea offer. (Goldstein Decl. ¶ 8.)  Rivera rejected the plea offer, continuing to insist that he had been entrapped and was therefore not guilty.  (Goldstein Decl. ¶ 8.)  Mr. Goldstein states that he advised Rivera that it would be difficult to convince a jury that he—a retired police officer—had been entrapped, and told Rivera, as is Mr. Goldstein's general practice, that the Government prevails in approximately 95% of federal criminal trials.  (Goldstein Decl. ¶ 9.)  Rivera responded that he was not guilty and that if he was going to get at least 10 years' imprisonment if he pled guilty, he might as well take his chances at receiving a 15 year sentence following a trial. (Goldstein Decl. ¶ 10.)  At numerous subsequent meetings, Mr. Goldstein continued to advise Rivera to seriously consider the Government's plea offer, and never refused to discuss the possibility of a plea.  (Goldstein Decl. ¶¶ 10-11.)  Rivera continued to insist that he was entrapped and expressed confidence that he would prevail at trial.  (Goldstein Decl. ¶ 12.)  Mr. Goldstein states that it was on that basis, and based on Rivera's refusal to accept a deal that would require him to plead guilty to a mandatory minimum of 10 years' imprisonment, that he rejected the Government's informal plea offer and proceeded to trial.  (Goldstein Decl. ¶ 12.)

On February 6, 2016, the Government filed its opposition to Rivera's petition. (ECF No. 39.)  As set forth in the Court's October 23, 2015 Order (ECF No. 136), Rivera's reply brief was due not later than 30 days after the Government filed its

10

opposition. Rivera's reply was thus due on March 7, 2016. To date, Rivera has not submitted a reply brief, nor has he requested an extension of time to do so.

II. LEGAL STANDARDS

A. Bar on Raising Issues That Were Raised or Could Have Been Raised on Direct Appeal

"In general, a defendant is barred from collaterally challenging a conviction under § 2255 on a ground that he failed to raise on direct appeal." United States v. Thorn, 659 F.3d 227, 231 (2d Cir. 2011). "An exception applies, however, if the defendant establishes (1) cause for the procedural default and ensuing prejudice or (2) actual innocence." Id. This procedural bar "does not generally apply to claims of ineffective assistance of counsel." Zhang v. United States, 506 F.3d 162, 166 (2d Cir. 2007).

B. Ineffective Assistance of Counsel

To prevail on a claim of ineffective assistance of counsel, a petitioner must show that (1) his or her counsel's performance "fell below an objective standard of reasonableness" measured under "prevailing professional norms," and (2) he or she was prejudiced by counsel's deficient performance such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington. 466 U.S. 668, 687-88, 694 (1984).

As to the first prong of Strickland, attorney conduct is subject to an objective standard of reasonableness, and is accorded deference in light of the "range of legitimate decisions" that accompanies the various circumstances encountered by

counsel. Id. at 688-89. As a result, reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, bearing in mind that there are countless ways to provide effective assistance in any given case and that even the best criminal defense attorneys would not defend a particular client in the same way." United States v. Aguirre, 912 F.2d 555, 560 (2d Cir. 1990) (alterations and quotation marks omitted) (quoting Strickland, 466 U.S. at 689).

As to the second prong of Strickland, a petitioner must show that, but for his or her attorney's deficient performance, there is a reasonable probability that the result would have been different. Strickland, 466 U.S. at 694. More is required than a mere showing "that the errors had some conceivable effect on the outcome of the proceeding," as "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." Id. at 693.

## III. DISCUSSION

Rivera's motion asserts that Mr. Goldstein, Rivera's counsel in the underlying criminal proceeding from June 2010 up until Rivera filed his direct appeal, rendered ineffective assistance in several respects bearing on Rivera's decision whether to accept the Government's plea offer or proceed to trial.[4] First, Rivera asserts that Mr. Goldstein failed to adequately advise him regarding a possible plea agreement that would have resulted in a mandatory minimum sentence of 120 months' imprisonment, in contrast to the 180-month sentence that Rivera ultimately

---

[4] Rivera does not allege that Mr. Goldstein rendered ineffective assistance at trial or at sentencing.

received.  (Pet. 5-6.)  Second, that Mr. Goldstein failed to apprise him of a deadline by which he had to accept the Government's plea offer.  (Pet. 5-6.)  Third, that Mr. Goldstein gave Rivera constitutionally deficient advice regarding the strength of the Government's case and whether he should proceed to trial.  (Pet. 6.)  Finally, and, relatedly, Rivera contends that Mr. Goldstein rendered ineffective assistance in advising Rivera as to the strength of his entrapment defense.  (Pet. 7.)  In essence, Rivera's arguments together comprise one single underlying claim—that Mr. Goldstein's ineffective advice led Rivera to reject the Government's plea offer when he otherwise should have accepted it.  Based on the trial record, the parties' submissions, and Mr. Goldstein's sworn declaration, Rivera's claims are entirely without merit.  His motion is therefore denied.  As explained below, the arguments that Rivera raises in his petition fail both prongs of the Strickland analysis.

To prevail on his ineffective assistance claim, Rivera must first show that his counsel's performance "fell below an objective standard of reasonableness" measured under "prevailing professional norms."  Strickland, 466 U.S. at 688.  Under prevailing professional standards, defense counsel must provide the client the benefit of counsel's professional advice on the decision of whether to plead guilty, and must explain the matter to the extent reasonably necessary to permit the client to make an informed decision.  Purdy v. United States, 208 F.3d 41, 45 (2d Cir. 2000).  To allow the client to make an informed decision, defense counsel must communicate the terms of the plea offer, the strengths and weaknesses of the case against him, and the alternative sentences to which he will most likely be

13

exposed.  Id.; see also Awan v. United States, No. 13-CV-1735 ARR, 2015 WL 5559723, at *4 (E.D.N.Y. Sept. 4, 2015).  The ultimate decision whether to plead guilty must, however, be made by the defendant, and counsel's "conclusion as to how best to advise a client in order to avoid, on the one hand, failing to give advice and, on the other, coercing a plea enjoys a wide range of reasonableness."  Purdy, 208 F.3d at 45.  Rivera fails to show that Mr. Goldstein's performance was constitutionally deficient, as the record clearly shows that Mr. Goldstein acted in accordance with prevailing professional norms.

First, in his declaration, Rivera himself acknowledges that Mr. Goldstein informed him that the Government made him a plea offer that would result in a 10-year minimum sentence.  (Rivera Decl. ¶ 15.)  Rivera thus has conceded that Mr. Goldstein informed him of the terms of the Government's plea offer.

Second, Mr. Goldstein's declaration clearly explains that Mr. Goldstein was able to solicit an informal plea offer from the Government and that he shared that offer—including that it would result in a 10-year mandatory minimum sentence versus a potential 15-year sentence if the Government succeeded at trial—with Rivera soon after receiving it.  (Goldstein Decl. ¶¶ 7-8.)  Mr. Goldstein further states that he—an attorney with 40 years of experience practicing criminal law who has represented over 10,000 criminal defendants—informed Rivera that it would be difficult to succeed on an entrapment defense and that the Government had a high likelihood of success, and continued to advise Rivera to seriously consider the plea offer, but that Rivera continued to assert that he was not guilty and that he desired

14

to take his chances at trial.  (Goldstein Decl. ¶¶ 2, 9-10.)  By informing Rivera of the terms of the plea offer, the strengths and weaknesses of the case against him, and the alternative sentences to which he would most likely be exposed, Mr. Goldstein provided constitutionally effective advice regarding Rivera's decision to reject the Government's plea offer.

Third, to the extent that Rivera's declaration contains generalized allegations that contradict Mr. Goldstein's sworn testimony as to the advice that he provided Rivera in relation to the plea offer, his assertions are self-serving, unsupported by any other evidence, highly improbable in light of all the relevant circumstances, and belied by the record of the underlying criminal proceeding; the Court rejects Rivera's assertions on those bases.  See, e.g., Chang, 250 F.3d at 86 (finding that a hearing was not required where the district court found defense counsel's detailed affidavit more credible than petitioner's contradictory "self-serving and improbable assertions"); Awan, 2015 WL 5559723, at *5.

Fourth, even if Mr. Goldstein told Rivera that his entrapment defense had a reasonable possibility of succeeding at trial, such advice did not constitute ineffective assistance based on the record in this case.  Mr. Goldstein presented sufficient evidence to get the Government to concede its inducement of the crimes charged, thereby shifting the burden to the Government to demonstrate that Rivera was predisposed to commit the crimes with which he was charged beyond a reasonable doubt.  See United States v. Cromitie, 727 F.3d 194, 204 (2d Cir. 2013).  Rivera also provided sworn testimony at trial to the effect that he had been

entrapped, which Mr. Goldstein used in his summation. Courts have found, under circumstances similar to those here, that it was not constitutionally ineffective for an attorney to assert that an entrapment defense had some probability of success. See, e.g., Siraj v. United States, 999 F. Supp. 2d 367, 374-75 (E.D.N.Y. 2013).

Additionally, even if Rivera could succeed on the first Strickland prong, his ineffective assistance claim would still fail on the second prong, which requires that he show prejudice as a result of his counsel's deficient performance. Strickland, 466 U.S. at 688. To demonstrate such prejudice here, Rivera "must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." Lafler v. Cooper, 132 S. Ct. 1376, 1385 (2012); see also Aeid v. Bennett, 296 F.3d 58, 63 (2d Cir. 2002). "[C]ourts have been skeptical of accepting a defendant's self-serving, post-conviction statements that he would have pleaded guilty if properly advised of the consequences by his attorney." Gluzman v. United States, 124 F. Supp. 2d 171, 177 (S.D.N.Y. 2000); see also Ayala v. Lee, No. 12-CV-0618 ERK, 2014 WL 3870008, at *3 (E.D.N.Y. Aug. 6, 2014). Based on the record before the Court and the Court's consideration of all of the relevant circumstances, Rivera has not demonstrated a

16

reasonable probability that he would have accepted the plea but for the advice he received from Mr. Goldstein.

First, nowhere in Rivera's declaration does he assert that, had he received different advice from counsel, he would have accepted the Government's plea offer subjecting him to a 10-year mandatory minimum sentence and a gun enhancement that would have increased his Guidelines exposure and may well have resulted in a sentence approaching the one ultimately imposed after trial. While Rivera alleges that he expressed a desire to accept a plea agreement in December 2011 (Rivera Decl. ¶ 25), he does not state that he would have accepted the only plea agreement that was offered to him. The absence of such an assertion is particularly significant in light of Mr. Goldstein's statement that Rivera said he would rather risk receiving a 15-year sentence after trial than a 10-year mandatory minimum sentence after a guilty plea. (Goldstein Decl. ¶ 10.)

Second, to the extent that Rivera suggests that he failed to accept the plea because Mr. Goldstein misrepresented the strength of the Government's case and the weakness of Rivera's entrapment defense, that claim is self-serving and inherently improbable under the circumstances. Mr. Goldstein's contrary assertions, that he warned Rivera that it would be difficult to succeed on an entrapment defense as a retired police officer and that the Government prevails in 95% of federal criminal trials (a statement that Mr. Goldstein asserts is part of his usual practice in advising clients) (Goldstein Decl. ¶ 9), render Rivera's bald assertions utterly implausible.

IV. CONCLUSION

For the reasons set forth above, Rivera's petition to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255 is DENIED.

The Court declines to issue a certificate of appealability because there has been no "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); see Matthews v. United States, 682 F.3d 180, 185 (2d Cir. 2012). The Court also finds, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from the denial of this motion would not be taken in good faith. See Feliz v. United States, Nos. 01 Civ. 5544(JFK), 00 CR. 53(JFK), 2002 WL 1964347, at *7 (S.D.N.Y. 2002).

The Clerk of the Court is directed to terminate the motion at ECF No. 134 in 10-cr-316 and to terminate the action in 15-cv-8328.

SO ORDERED.

Dated:   New York, New York
         March 14, 2016

                                            _____
                                                KATHERINE B. FORREST
                                                United States District Judge